ROUSE *v.* BLAIR.

1. RAILROADS — CROSSING ACCIDENT — SIGNALS — STOP, LOOK AND LISTEN.

In an action for personal injuries sustained by plaintiff, his wife, and child, at a railroad crossing which he was driving over in a covered automobile, evidence that defendant's train was being operated backward, without a lookout stationed at the end of the train, and without giving the statutory signals, that as plaintiff approached the crossing from the east he slowed down and was able

to look both ways, that when but a short distance from the track the regular passenger train passed north, that thereafter he and his wife kept constant lookout, that about 150 feet from the track plaintiff was able to see about 1,200 feet south, that he looked and saw no train in that direction, that thereafter the view was obscured by cars and buildings, and that about a quarter of a mile south of the highway the track curved and was obscured by trees and brush, that when he arrived within 18 or 20 feet from the track he discovered the approaching train from the south and attempted to cut off his gasoline and applied his emergency brake, that the automobile was making but a slight noise and that he discovered the train too late to avoid a collision, that the rate of speed of the freight was 25 or 30 miles an hour in passing through the village where plaintiff was injured; *held*, to present a question for the jury whether plaintiff was guilty of contributory negligence in failing to come to a full stop before attempting to drive upon the track.

2. SAME — GROSS NEGLIGENCE — EFFECT ON CONTRIBUTORY NEGLI-GENCE.

The conduct of defendants in operating the train without signals and without a lookout was not such gross or wanton negligence as would authorize plaintiff to recover notwithstanding his contributory negligence, but the question of defendant's want of care in so operating its train was a proper question for the jury.

3. SAME—CONTRIBUTORY NEGLIGENCE—DUTY TO EXERCISE CARE.

After finding that he was in peril by reason of defendant's negligence if the plaintiff did not act with coolness or sufficiently protect himself from the unexpected danger, it was for the jury to determine whether he was guilty of contributory negligence.

BROOKE, C. J., and OSTRANDER and STEERE, JJ., dissenting.

Error to Berrien; Des Voignes, J. Submitted January 28, 1915. (Docket No. 117.) Decided April 19, 1915.

Case by Elmer E. Rouse against Frank W. Blair and others as receivers of the Pere Marquette Railroad Company, for personal injuries to himself, his

wife, and child. Judgment for defendants upon a directed verdict. Plaintiff brings error. Reversed.

*Cady & Andrews,* for appellant.

*Parker, Shields & Brown* (*Gore & Harvey,* of counsel), for appellees.

STONE, J. The plaintiff brought this suit to recover damages for personal injuries to himself and also to his wife and child, at a railroad crossing in the unincorporated village of Bridgman, on September 19, 1913. The court below directed a verdict and judgment in favor of defendants. Plaintiff asks us to reverse that judgment, contending that his testimony made a case entitling him to the judgment of the jury. We state the testimony, placing upon it, as we should, the construction most favorable to the plaintiff. The plaintiff, his wife, and a child seven years of age, were injured by a collision between one of defendants' work trains and an automobile in which plaintiff, wife, and child were riding across the track of the Pere Marquette Railroad Company, in said village, about 10 o'clock in the forenoon. The village had but one main street or highway, which extended east and west, and which furnished the only entrance to the village, and was quite extensively traveled, as the village was the shipping point of fruit raised in the neighborhood. On account of the village's proximity to Lake Michigan, the general travel was from the east into the village. The defendants' railroad crosses this main highway at the easterly side of the village, and was composed of one main track, a side track on the west of the main track, and a blind or stub track on the east of the main track and south of the highway, ending near the south sidewalk. The depot was about 40 feet south of the highway, and on the west side of the main railroad track and east of

the side track. This stub or blind track was used by a fruit growers' association to load fruits, and on the day in question there were standing upon it several refrigerator cars. Within 150 feet east of the main track the buildings on the south side of the highway were: First, a building called the association building, which was next east of a driveway along the east side of the stub track; a second building, known as the barber shop or poolroom, was from 100 to 150 feet east of the main track. Between the poolroom and the association building was an opening 50 or 60 feet wide, giving a clear, unobstructed view of the track to the south about 1,000 to 1,200 feet. From the association building to the main track the view was completely obstructed by the building and the line of refrigerator cars standing upon the stub track until the refrigerator cars were passed. The plaintiff (who resided at Benton Harbor, about 16 miles away, and who had driven in in a covered delivery automobile with his wife and child) was injured at the crossing as he was approaching the village from the east on this highway. The drive of the automobile was a right-hand drive, and it was being driven by the plaintiff. The child had been seated upon its mother's lap, until they neared the railroad crossing, when the mother stood the daughter in front of her, in order, as she testified, that she "could look both ways." When but a short distance from the main track, the regular, scheduled passenger train, was seen by the plaintiff to go north; however, both plaintiff and his wife kept a constant lookout and listened for any approaching train until they reached the crossing. At the opening between the said buildings, which was 50 to 60 feet wide, plaintiff and his wife looked toward the south, where they could see a distance of about 1,000 to 1,200 feet, and there was no train in sight, nor any sign of an approaching train. The railroad

track curved to the west about a quarter of a mile
south of the highway, and there were trees and bushes
at this point that obscured a further view of the track.
Plaintiff continued to keep a lookout both ways for
trains, until after passing the end of the box cars that
were standing on the stub side track, when he saw,
for. the first time, a train backing down upon him
from the south. When he passed these box cars
where he could see the train, he was within 18 or 20
feet of the main track where he was sitting in the seat,
the car extending 4 feet or more in front of seat.
Upon seeing the train, plaintiff immediately cut off
the gasoline, opened the clutch of his automobile, and
applied his emergency brake. When opposite the said
buildings plaintiff reduced the speed of his automo-
bile to four or five miles an hour, and continued at
this rate of speed until he passed the end of the box
cars, and was driving at not to exceed four miles an
hour when he first discovered the approaching train.
The automobile was making but a slight noise. When
plaintiff first saw the train, he testified that it was too
late to speed up and get across, and too late to turn,
and too late to stop in time to avoid collision, and
that he did all he could to escape the injury. The
train in question was made up of 21 or 22 cars, with
a flat car in front, followed by a caboose car and 20
others, at the end of which, and pushing the train,
were the tender and engine. This train was at Saw-
yer, a station about six miles south of Bridgman, when
the regular passenger train going north passed
through. When the passenger train pulled out of
Sawyer, this work train pulled out and followed, push-
ing the 22 cars ahead of the engine.

In taking the case from the jury, the trial court
said:

"This train was running wild; that is, it was not
a scheduled train."

We are unable to find any testimony on the subject in the record. At the time of the collision it was running at a rate of speed of from 25 to 30 miles an hour through the village and across the highway. There was no person stationed at the crossing, and no person stationed on the front car of the backing train. The whistle was not blown, and the bell was not rung on the train in question as it approached the crossing. In describing the condition of the automobile the plaintiff testified:

"It was an inclosed Studebaker car. The sides of the car were covered. I can't tell you exactly how deep the seat of the automobile was, but it was a little bit more than 16 inches. The top of the car extended over the windshield. In order to see out of the car you would not necessarily have to lean forward and get your face a little past the side of the car, because there were windows that we could see through. The top bent down toward the engine. There were windows on each side that we could see through. A person driving could look out of the windows either way and see."

On the cross-examination of the plaintiff the following testimony was given:

"*Q.* Did you stop your own car?
"*A.* Not entirely; nearly so.
"*Q.* You did not stop?
"*A.* Not to a dead stop.
"*Q.* So you could ascertain if there was a train coming?
"*A.* If the train—
"*Q.* Answer the question. Did you stop your car when you saw a car standing on the switch track, so you could ascertain a train was coming?
"*A.* I did not stop the car after—we had listened for a whistle or some signal to notify us that there was a train coming; while we had been watching and listening, we received no warning or signals of any sort of danger approaching; while we had slowed down, and going slow enough so as to see and hear, there was no signal or sound given us.

"*Q.* You did not stop, did you?
"*A.* We did not stop—full stop.
"*Q.* You did not stop so you could make sure?
"*A.* We stopped so we could be reasonably sure."

The automobile was struck midway, while upon the track, by the backing train, and carried before the train a distance of 530 feet before the train stopped. The automobile was ruined, and the plaintiff and his wife received serious, and it was claimed permanent, injuries from the collision. The testimony being closed on the part of the plaintiff, a motion was made by the defendants for a directed verdict in their behalf, upon the ground that the plaintiff was guilty of contributory negligence, as shown by the testimony in his behalf. The trial court granted the motion, and held that the plaintiff was guilty of contributory negligence, as matter of law, for failure to come to a full stop before reaching the track, and directed a verdict of no cause of action. An examination of the charge discloses that in the opinion of the trial court the case was ruled and governed by *Shufelt* v. *Railroad Co.*, 96 Mich. 327 (55 N. W. 1013).

The main question raised and argued by counsel is, Was the trial court justified, as matter of law, in holding that, under the circumstances of this case, it was imperative upon the plaintiff to come to a full stop, before attempting to cross the railroad in question?

The plaintiff's claims are:

*First.* That under the circumstances of this case the plaintiff was entitled to have his case submitted to the jury, on the question of contributory negligence, under proper instructions.

*Second.* That if plaintiff was guilty of contributory negligence in crossing defendants' track without first coming to a full stop, yet the plaintiff is entitled to recover, as the facts shown at the trial established gross and great negligence on the part of the defendants in the backing of their train, with the engine in

the rear, and consisting of 22 cars, at such a high rate of speed, over the highway in question, and without giving any signal or warning whatever of its approach.

We will discuss these claims in the inverse order in which they are presented. Under the more recent holdings of this court upon the question as to what constitutes gross and wanton negligence, we are unable to agree with appellant that the defendants were guilty of such gross negligence in the operation of the train which collided with plaintiff's automobile as would authorize recovery, notwithstanding the contributory negligence of the plaintiff. *Knickerbocker* v. *Railway Co.*, 167 Mich. 596 (133 N. W. 504) ; *Putt* v. *Railway Co.*, 171 Mich. 216 (137 N. W. 132). That such manner of operating a train would be negligence, and was the proximate cause of the injury, were questions which might, in our opinion, have been 'properly submitted to the jury. It is not seriously claimed by defendants that the train was not operated in a negligent manner, but it is said that the failure to blow the whistle or ring the bell, even in connection with the backing of the train and the failure to have a man stationed upon the first car as a lookout, did not constitute the proximate cause of the plaintiff's injury, but that the proximate cause was plaintiff's failure to come to a full stop before attempting to cross the track. Can this be said as matter of law? Plaintiff had a right to expect that defendants' trains would be operated in a lawful manner. We think that the controlling question is whether the conduct of the plaintiff was that of a reasonable man, under the circumstances. Did the plaintiff conduct himself as a reasonably prudent man would have acted, while rightfully expecting the defendants to handle their train in a lawful manner? These, it seems to us, were questions for the jury. If

the jury should say that the defendants negligently operated the train, and that this was the proximate cause of the injury, and that the plaintiff did, under the circumstances, all that a reasonably prudent man would be called upon to do, and that the injury would not have occurred had the defendants been lawfully operating the train, then the plaintiff would be entitled to recover.

In our opinion, the *Shufelt Case* is not controlling here. In that case the plaintiff's wife was driving in a lumber wagon with a box, and the road was dry and hard, so the noise of the horses and wagon traveling over a hard road was great. She did not listen for any train or signals. It was a regularly scheduled passenger train, somewhat behind time, crossing a highway in the country, where travel was limited, and the signals were given both by bell and whistle. In the instant case the plaintiff was driving slowly, in an automobile, the engine of which was making a very slight noise. Plaintiff was constantly looking and listening for a train. He had just seen the regular passenger train go north, and the collision resulting in his injury was caused by what the trial court called a "wild train," consisting of 22 cars, with the engine placed in the rear. No signal by either bell or whistle was given, and in fact no proper signal could be given from the engine while in the rear of such a long train. A high rate of speed was used by the backing train over a highway where there was much traffic, and no lookout was placed on the approaching train. Whether this combination of facts might not rightfully lead the plaintiff to believe that he was safe in attempting to make the crossing, was, in our opinion, a question for the jury. Where different conclusions may be drawn from established facts, the question belongs to the jury. *Beck* v. *Railroad Co.*, 156 Mich. 252-258 (120 N. W. 983). If,

after passing the box cars, and when finding himself in peril by defendants' negligence, plaintiff did not act with coolness, the jury should say whether he was guilty of contributory negligence. *Fehnrich* v. *Railroad Co.,* 87 Mich. 606 (49 N. W. 890) ; *Mercer* v. *Railroad Co.,* 151 Mich. 566 (115 N. W. 733). The *Shufelt Case* was affirmed by a majority of one, and it may be said that the signal given was a controlling feature which caused the affirmance.

"Ordinarily, when a traveler drives upon a railway track without stopping to listen, where his view is obstructed, and in consequence thereof he is injured, he is, under the law, guilty of contributory negligence, but the rule * * * is not imperative under all circumstances."

The above is the latest expression of this court upon the subject. *Morgan* v. *Railroad Co.,* 162 Mich. 573-576 (127 N. W. 683). In that case Chief Justice BIRD also said:

"Viewing plaintiff's conduct in connection with the surroundings and the conduct of the defendant in operating its train without a headlight or lookout, we are unable to say, as a matter of law, that plaintiff so far contributed to his own injuries that it will preclude recovery. The plaintiff testified, and his testimony is corroborated by two witnesses, that his horse was walking very slowly when he approached the main crossing as well as the other crossings. He looked and listened at each of the crossings. He understood that a train ran in the early morning, conveying the miners to their work, but he had never seen it at this crossing and was not expecting it."

If the rule above stated could be applied when a train was on its regular morning trip, may it not be applied in the instant case, where no train was scheduled or expected? We think so. This court has recognized various exceptions to this general rule of requiring the traveler to stop before making the cross-

185 Mich.—41.

ing, when the view is obstructed. *Guggenheim* v. *Railway Co.*, 66 Mich. 150 (33 N. W. 161); *Richmond* v. *Railway Co.*, 87 Mich. 374 (49 N. W. 621); *Breckenfelder* v. *Railway Co.*, 79 Mich. 560 (44 N. W. 957); *Barnum* v. *Railway Co.*, 137 Mich. 580 (100 N. W. 1022); *Id.*, 148 Mich. 370 (111 N. W. 1036); *Coffee* v. *Railroad Co.*, 139 Mich. 378 (102 N. W. 953); *Hintz* v. *Railroad Co.*, 140 Mich. 565 (104 N. W. 23); *Beck* v. *Railroad Co.*, *supra.* Our attention has been called to cases in other jurisdictions, but we think that the subject is covered by our own decisions.

We are of the opinion that the trial court erred in not submitting to the jury the question of the claimed contributory negligence of the plaintiff, under proper instructions.

The judgment of the circuit court is reversed, and a new trial granted.

MCALVAY, KUHN, BIRD, and MOORE, JJ., concurred with STONE, J.

OSTRANDER, J. I think the court below was right, and that the judgment should be affirmed.

BROOKE, C. J., and STEERE, J., concurred with OSTRANDER, J.