HALLORAN *v.* MICHIGAN RAILWAY CO.

1. TRIAL—ARGUMENT OF COUNSEL.

　It is error to allow plaintiff's counsel, over objection, to comment in his argument on the law of contributory negligence in railroad crossing accident cases in an action for death in a railroad crossing accident where the court has ruled that the question of contributory negligence of deceased is not an issue for the jury and that the only question is that of gross negligence of defendant.

2. RAILROADS—CONTRIBUTORY NEGLIGENCE—INSTRUCTIONS.

　In an action against an interurban railroad to recover for the death of the driver of a wagon at a crossing in a village by one of defendant's cars, where the view of the driver was obstructed by the depot platform and the rising ground as he approached the crossing, and the court ruled that deceased was guilty of contributory negligence, an instruction that if the jury found that the rate of speed of the car was excessively great as it approached the next crossing and at any point where deceased came into view and ordinary care and prudence and a due regard for human life would require a lesser speed or precautions for the stopping of the car sooner and by the exercise of ordinary care the accident could and should have been prevented, the failure to take such precautions constituted gross negligence, was erroneous.

3. SAME—GROSS NEGLIGENCE—DISCOVERED PERIL.

　The antecedent negligence of the motorman of an interurban car in going at an excessive speed through a village before he discovers the contributory negligence of the driver of a team at a crossing is not gross negligence, although in connection with it failure to make every reasonable effort to avoid the accident after the concurring and contributing negligence of the driver has been, or ought to have been, discovered, may become such.

4. SAME—GROSS NEGLIGENCE—EVIDENCE—SUFFICIENCY.

　Evidence *held,* insufficient to raise an issue of fact for the jury as to the gross negligence of defendant.

5. SAME—CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY — EVI-
DENCE—CROSSING ACCIDENTS.

It was a question for the jury whether deceased was guilty
of contributory negligence where the view of deceased
as he approached the crossing was obstructed by the
station platform and by the rising ground and the evi-
dence was conflicting as to whether he approached the
crossing carelessly, without stopping to look and listen,
whether proper signals of the approach of the car were
given, and, if given, whether they could be heard by one
approaching the crossing along the highway, and at what
point upon the highway near the crossing a car coming
could be first seen as it passed the station, and it further
appeared that the road was new, that deceased had never
crossed the tracks before and did not know that defendant
operated through trains.

6. SAME—CROSSING ACCIDENTS — CONTRIBUTORY NEGLIGENCE — EVI-
DENCE.

While failure to stop, look, and listen before driving upon
an interurban railroad crossing with a wagon . is, as a
rule, strong and generally controlling evidence of con-
tributory negligence where injury results, the rule is not
imperative in all cases, when the view is obstructed.[1]

7. SAME—QUESTION FOR JURY.

*Held*, on conflicting evidence, that it was a question for
the jury whether the crossing was unusually dangerous.

8. SAME—NEGLIGENCE—QUESTION FOR JURY.

The negligence of defendant was a question for the jury,
where the train, which struck deceased, was a through
train going at 70 to 75 miles per hour through a village,
and the view on the approach to the crossing was obstruct-
ed, in an action against an interurban railroad company
to recover for the death of the driver of a wagon at a
street crossing.

9. SAME—NEGLIGENCE—CROSSING ACCIDENTS.

The question of the negligence of defendant railroad com-
pany in running into and killing the driver of a wagon
at a village crossing at which it does not stop does not
turn upon the general rate of speed the car made or what
its schedule was, but whether, at the particular location,

---

[1]For authorities passing on the question of duty of traveler
to look and listen before crossing the tracks of an electric road.
see notes in 15 L. R. A. (N. S.) 254; 23 L. R. A. (N. S.) 1224.

the car was run at a speed, managed and controlled with that degree of care required in prudent railroad management for the safety of the lives and property of the persons rightfully approaching and traveling over such crossing.

Error to Kent; Tappan, J., presiding. Submitted January 23, 1917. (Docket No. 95.) Decided July 26, 1917.

Case by John M. Halloran, administrator of the estate of Albert Brog, deceased, against the Michigan Railway Company for the negligent killing of plaintiff's intestate. Judgment for plaintiff. Defendant brings error. Reversed.

*Mechem & Mechem,* for appellant.

*McKenna & Herman,* for appellee.

STEERE, J. Plaintiff's intestate, Albert Brog, was struck and instantly killed by one of defendant's south-bound interurban cars at a highway crossing in the village of Moline, Mich., shortly before 2 o'clock in the afternoon of June 12, 1915, and this action was brought by plaintiff under the instant death act to recover damages resulting to deceased's estate.

Moline is a small village located a little over 16 miles south of the city of Grand Rapids, through which defendant's line between Grand Rapids and Kalamazoo runs upon a private right of way, except where it crosses streets and highways. Its cars are operated under electric power conducted to them by a third rail, except in streets, highways, and places not inclosed, where a trolley wire is used.

At the time of the accident this line had been recently completed, and in operation little less than a month. Defendant was then operating daily over the line 35 so-called "trains," 17 running north and 18 running south, a train consisting of but a single car. Three of these, running daily each way, were fast

trains called "fliers" and did not stop at Moline. The car which caused the accident, numbered 800, was a modern type, heavy, interurban passenger car, 68 feet long, 14 feet high, 9 feet 8 inches wide, weighing 73 tons, having a vestibule, day coach, chair car department, smoking room, and baggageroom separated by partitions, with air brakes, gong, whistle, etc. It ran as a flier train, known as No. 68, due to leave Grand Rapids at 1:30 and arrive at Kalamazoo at 2:40 p. m., a run of 49.72 miles. It was in charge of Motorman Kenyon and Conductor Callahan, recognized as competent and experienced men in their line of duty. The car was about three minutes late in passing Moline. The testimony as to its speed at the time of the accident and shortly before is in dispute. Plaintiff claimed and introduced testimony tending to show it was running at a speed of from 70 to 75 miles an hour. Kenyon the motorman testified he was going through Moline at 45 or 50 miles an hour, and had been going from 55 to 60 miles an hour, that he ran 769 feet after striking deceased, and estimated he had retarded the speed of the car with the emergency brake 10 to 15 miles an hour before he struck him.

Of the environments of the accident it was shown that about 140 feet west of defendant's track the Grand Rapids & Indiana Railroad runs practically parallel for some distance, and still further west, beyond the Grand Rapids & Indiana track, is the principal street of the village of Moline, extending for about a block north and south, open on the east side to defendant's railway, and lined on the west side by buildings used for various business purposes facing towards the tracks. In securing its right of way defendant purchased some land in Moline on which was located a two-story frame dwelling house just east of its line which it converted into a station. It stood about 22 feet east of the center of defendant's track, but not

exactly square or parallel with it. A highway runs north and south about 200 feet east of defendant's railway. Two parallel highways about 480 feet apart running east and west into the village cross it and the railway tracks, one passing north and the other south of defendant's station, the south one, upon which the accident occurred, being about 186 feet south of the station; 865 feet north along the track from the center of this south highway defendant's third rail ends, with a cattle guard a short distance south of the end. From the end of the third rail north of the village to a point about 700 feet south of the south crossing where the third rail again begins there is a trolley wire. A side track leaves the main line at a point south of the south highway and runs north across it parallel with the main track, ending at the station building. It is on a level with the main track and of similar construction. The station platform extends out to the main track in front of the building and is elevated a little over 4 feet above the rail. It also extends south along the east of the side track for a distance of about 60 feet beyond the station. The grade of defendant's track through Moline is level, with the roadbed elevated but a little above the surrounding surface of the ground, while the grade of the Grand Rapids & Indiana track is about 4 feet higher. The south highway is substantially level as it approaches the crossing from the east to within about 95 feet of defendant's side track, gradually ascending from there to the level of its two tracks, crossing them on a level and descending between them and the Grand Rapids & Indiana track for about 40 feet, then gradually ascending to the Grand Rapids & Indiana track and descending again to the general level after crossing it.

Albert Brog was a farmer about 42 years old, living with his wife and two children on his farm of 60 acres located 4 miles south and east of Moline. He generally

traded at a town named Wayland, farther south on defendant's line and more convenient to his home, but had occasionally been to Moline, the last time, so far as shown, being the prior January, when he went to receive payment of taxes for his township, of which he was treasurer. Defendant's road was not then operating, but had been under construction for some time. On the day of the accident he left his home for Moline in a single box lumber wagon, with a spring seat, drawn by his farm team, having some bags of grain in the back of his wagon box. He approached the village from the east along the south highway, and just as he drove upon defendant's tracks at the crossing flier No. 68, coming from the north, struck and demolished his rig, throwing him a distance of 129 feet, causing instant death.

The issues to which testimony was directed and over which the parties contended under the disputed facts, or by inferences from the undisputed facts, involved counter charges of negligence, including contributory negligence by plaintiff's decedent and discovered or gross negligence on the part of defendant. The trial court instructed the jury as a matter of law that plaintiff's decedent was guilty of contributory negligence, and submitted the question of defendant's gross negligence as an issue of fact for their determination. The trial resulted in a verdict of $5,000 in favor of plaintiff. The questions raised for review were presented and preserved upon the trial by timely objections, motions, and requests, and on motion for a new trial, which was overruled.

Prejudicial error is assigned and urged upon the court permitting plaintiff's counsel, against objection, to debate to the jury the question of deceased's contributory negligence, after disposing of it as a matter of law. In summing up the case plaintiff's counsel said to the jury in part:

"It has come to pass in this State almost that no man can cross a railroad crossing, no matter whether he is afoot or with a team or an automobile or how he may be, unless he is guilty of what the law calls contributory negligence. It don't make any difference what he does, how he looks or when he looks or where he stops or whether he goes ahead or whether he turns around; if he does the wrong thing usually it is said that that is contributory negligence in the crossing of a railroad in this State. Unfortunately that has come to be true in this State."

Objection being made to this line of argument and correction of counsel asked, the court said:

"I don't see any objection to that statement. It may stand."

And counsel was permitted to continue the discussion applying such views to the case in hand. The court had ruled that contributory negligence was not an issue for the jury, and the only question of fact to be submitted was defendant's gross negligence. Counsel's insistent discussion of the subject, apparently with approval of the court, could serve no purpose but as prejudicial appeal to the jury to disregard the ruling of the court and decide in plaintiff's favor the question of contributory negligence as an issue of fact. Under the theory upon which the case was submitted, permitting such argument to the jury against objection was manifest error.

Plaintiff's declaration does not, in the phraseology adopted, charge that the misconduct complained of was wanton, wilful, reckless or gross, but alleges that defendant's described conduct of omission and commission was careless and negligent, and, so far as the record discloses, the theory of gross negligence was first advanced, or at least emphasized, by the court on conclusion of plaintiff's testimony, in overruling defendant's motion for a directed verdict on the ground that the negligence of plaintiff's intestate had caused

or contributed to the accident, and no actionable negligence on the part of defendant was shown. After argument of the motion the court said:

"I shall refuse to take the case from the jury, and will instruct the jury plaintiff can recover only on showing of conduct amounting to gross negligence."

Objection to this was then made by defendant on the ground that the declaration was not framed on the theory of a right to recover notwithstanding contributory negligence of plaintiff's intestate, and gross negligence was not pleaded. The court stated, however, that the case would be submitted to the jury on the question of gross negligence only, and the trial proceeded under such ruling.

Counsel for plaintiff state that the ruling as to contributory negligence was "to our surprise," and the subsequent argument to the jury on that subject, before referred to, "was merely in the nature of a reply to the court's ruling"; while counsel for defendant intimate similar, but suppressed, emotions on the subject of gross negligence.

Under the views expressed in *Weitzel* v. *Railway*, 186 Mich. 7 (152 N. W. 931, 153 N. W. 831), it can well be questioned whether the declaration was sufficient for the theory on which the case was submitted, but, beyond the question of pleading, the theory of antecedent negligence as gross negligence, upon which that question was submitted to the jury, is not tenable. The court charged upon that issue in part as follows:

"If you find from the proofs that the rate of speed of the car was excessively great as it approached the north crossing, and at any point where the deceased came into view, and you also find that ordinary care and prudence and a due regard for human life would require the motorman to run more slowly or take precautions to stop the speed of the car sooner, and that by the exercise of ordinary care in this respect the accident could and should have been prevented by this

means, then the failure to take these precautions would amount to gross negligence."

This instruction relates to a situation where it is found by the court that plaintiff was as a matter of law guilty of contributory negligence. We discover no testimony from which a jury could fairly infer that after discovering deceased was actually in or about to put himself in a place of danger the motorman acted maliciously, wantonly, or in reckless disregard of his duty, or failed to do all that he then could to avert or minimize the accident. If negligent at all, his negligence occurred in assuming the excessive rate of speed before he discovered deceased's negligence, as the court determined it was. Such antecedent negligence, even though great, is not gross negligence as defined by this court, though in connection with it failure to make every reasonable effort to avoid the accident after the concurring and contributing negligence of the party injured has been, or by reasonable diligence ought to have been discovered, may become such. *Richter* v. *Harper*, 95 Mich. 221 (54 N. W. 768) ; *Fritz* v. *Railway Co.*, 105 Mich. 50 (62 N. W. 1007) ; *Labarge* v. *Railroad Co.*, 134 Mich. 139 (95 N. W. 1073) ; *Putt* v. *Railway Co.*, 171 Mich. 216 (137 N. W. 132) ; *Good Roads Construction Co.* v. *Railway Co.*, 173 Mich. 1 (138 N. W. 320) ; *Berry* v. *Railway Co.*, 173 Mich. 181 (138 N. W. 1038) ; *Vought* v. *Traction Co.*, 194 Mich. 343 (160 N. W. 631). Measured by these decisions and others to which they refer, the testimony in this case falls far short of raising any issue of fact for a jury upon the question of defendant's gross negligence, and this verdict rendered upon that theory cannot be sustained.

We are unable, however, to concur with defendant's contentions that the undisputed testimony establishes deceased's contributory negligence as a matter of law, and that plaintiff's testimony wholly fails in support

of his charge that defendant was guilty of negligent conduct. We are of opinion that plaintiff is entitled to have both these issues submitted to the jury under proper instructions.

Upon the question of contributory negligence the testimony is in marked contrast in material particulars. Defendant claimed and introduced testimony tending to show that plaintiff's decedent approached this crossing carelessly, without stopping to look and listen, and upon seeing the approaching car, while yet in a place of safety some distance east of the side track (which is from 4 to 6 feet east of the main track), recklessly whipped his horses to a run and unsuccessfully endeavored to cross in front of the approaching car, the motorman testifying he "was coming up that incline about 20 or 25 miles an hour." On the other hand, plaintiff introduced testimony showing or tending to show that his decedent was driving slowly and carefully along the highway towards the village, watching in every direction, following close behind a buggy which drove over the track in safety ahead of him without any indication of having observed an approaching train; that as he approached the track with his horses upon a walk he first looked north up the track towards the station, then to the south, then to the north again, and as his horses were just going upon the side track the car came in view as it passed the station, and, manifestly taken by surprise, he rose in haste, leaned forward, and struck his horses with the lines, starting them hurriedly forward; that intervening trees, shrubbery, buildings, and particularly defendant's station, with the platform projecting in front of it, obscured his view to the north as he drove eastward along the highway until he approximately reached the side track, by reason of which and the incline of the road along which he was driving he was unable to see a car until he was close to the track, when one came

in sight as it passed the station running at such speed that it reached him in less than 2½ seconds; that he had not been in Moline since the road was in operation, and had never crossed this track; that Moline was a regular station on defendant's line where all its cars stopped except these "fliers," and he had no knowledge or reason to expect that a car would pass the station without stopping, until this car came suddenly in sight from that direction bearing down upon him at a speed of from 70 to 75 miles an hour; that his horses were then just passing over the side track, closely paralleling the main track on the east and nearest the station, which in the emergency, as he saw the situation, might naturally lead him to think that he was upon the main track, and had he been, by whipping up his horses as he did, he would have crossed them safely. Witness Otto Frey, who was driving the buggy which crossed just ahead of deceased, testified that while driving on a slow trot he passed Brog, who was driving still slower, a short distance east of the crossing; that as he approached the crossing he slowed up, looked north, then looked south, then looked north again, heard and saw no car and proceeded to cross; that just about as he was on the main track he saw an interurban car somewhere north of the north crossing beyond the station; that he had not up to that time heard any whistle or car coming, and when he was just about half way between the interurban and Grand Rapids & Indiana tracks he heard the crash of the accident behind him. The testimony is in conflict as to proper signals of the car's approach being given, where, if given, whether they could be heard south of the station by one approaching the crossing along the highway, and at what point upon the highway near the crossing a car coming from the north could first be seen as it came past the station.

While failure to stop, look, and listen before driving

upon a railway crossing is as a rule strong and generally controlling evidence of contributory negligence where injury results, the rule is not imperative in all cases. In *Rouse* v. *Blair*, 185 Mich. 632 (152 N. W. 204), it is said:

"This court has recognized various exceptions to this general rule of requiring the traveler to stop before making the crossing, when the view is obstructed. *Guggenheim* v. *Railway Co.*, 66 Mich. 150 (33 N. W. 161); *Richmond* v. *Railway Co.*, 87 Mich. 374 (49 N. W. 621); *Breckenfelder* v. *Railway Co.*, 79 Mich. 560 (44 N. W. 957); *Barnum* v. *Railway Co.*, 137 Mich. 580 (100 N. W. 1022); *Id.*, 148 Mich. 370 (111 N. W. 1036); *Coffee* v. *Railroad Co.*, 139 Mich. 378 (102 N. W. 953); *Hintz* v. *Railroad Co.*, 140 Mich. 565 (104 N. W. 23); *Beck* v. *Railroad Co.*, 156 Mich. 252 (120 N. W. 983)."

Under the conflicting testimony upon material facts we are unable to say, as a conclusion of law, that there was no issue for the jury upon whether deceased might not reasonably believe from the situation as presented to him that he was safe in proceeding to cross, and in what he did conducted himself as a reasonably prudent and cautious man would have done under like circumstances, while expecting, as he had a right to do, that defendant would operate its cars over its line in a lawful manner.

There is testimony in the case that this fast train, behind its scheduled time, running past its station through the village and over closely adjacent crossings, was speeding by at from 70 to 75 miles an hour, while by the location of its station and platform defendant had made it more difficult for one traveling east on the south highway to see a car coming from the north when approaching the crossing, rendering it additionally dangerous in that particular. To what extent, if any, it was an unusually dangerous crossing is a matter upon which the testimony is in sharp conflict

and a question of fact. The question of defendant's negligence does not turn upon the general rate of speed this car made or what its schedule was, but whether at this particular location the car was run at a speed, managed and controlled with that degree of care required in prudent railroad management for the safety of the lives and property of the persons rightfully approaching and traveling over such crossing. In *Folkmire* v. *Railways Co.,* 157 Mich. 159 (121 N. W. 811, 17 Am. & Eng. Ann. Cas. 979), this court said, referring to decisions where it has been held not negligence to run cars or trains through the country at a high rate of speed:

"These cases do hold that the exigencies of modern travel require rapid transit, and sustain the statement hereinbefore made that a steam car is not necessarily negligently run when a high rate of speed is attained, and that speed alone is not *per se* negligence. It does not follow that a rate of speed making it impossible to get off from a track in safety after it is possible to discover a car is not a negligent rate of speed, nor that it is not negligent to maintain a highway crossing, exceptionally dangerous, without some provision for preventing such accidents. It is true that the whistle and incessant ringing of the bell, together with the noise accompanying a heavy train on a steam road, has generally been deemed sufficient care without placing flagman or electric bells on the crossings, but there are cases where the contrary has been held."

References to certain matters thought to indicate issues of fact for determination by a jury in no sense imply or are to be taken as indicating in what manner the jury should decide those issues. We deem it unnecessary to pass upon other questions raised, as we cannot assume they will arise on a retrial of the case.

The judgment is reversed, with costs to defendant, and a new trial granted.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.